*This opinion is subject to revision before final publication in the Pacific Reporter*

**2016 UT 51**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ESAR MET,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20140522
Filed November 21, 2016

On Direct Appeal

Third District, Salt Lake
The Honorable Judith S. H. Atherton
No. 081902720

Attorneys:

Herschel Bullen, Salt Lake City, for appellant

Sean D. Reyes, Att'y Gen., John J. Nielsen, Asst. Solic. Gen.,
Salt Lake City, for appellee

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, JUSTICE DURHAM,
and JUSTICE HIMONAS joined.

ASSOCIATE CHIEF JUSTICE LEE filed a concurring opinion.

JUSTICE PEARCE, opinion of the Court:

¶1 Defendant Esar Met appeals his convictions on one count of aggravated murder, *see* UTAH CODE § 76-5-202, and one count of child kidnapping, *see* UTAH CODE § 76-5-301.1, each a first degree felony. Met is currently serving two concurrent sentences of life in prison without parole for these convictions.

¶2 Met raises a panoply of issues on appeal. He challenges the constitutionality and the district court's application of Utah's noncapital aggravated murder sentencing statute, Utah Code section 76-3-207.7. He contends that the district court improperly ruled that the State could use a transcript of his police interview for impeachment purposes if he chose to testify. He also argues that the police violated the Fourth Amendment to the United States Constitution when they searched his apartment without a warrant and that all evidence stemming from the allegedly illegal search should have been suppressed. Met asks us to conclude that the district court improperly admitted two photographs of the victim, which he contends are prejudicially gruesome. He also argues that the district court erred by declining to merge his child kidnapping conviction with his aggravated murder conviction. Finally, he argues that his trial counsel provided constitutionally ineffective assistance by failing to pursue a mistrial motion related to the State's failure to test and preserve certain evidence.

¶3 We conclude (1) that Utah Code section 76-3-207.7 is not constitutionally deficient, (2) that the district court did not abuse its discretion with respect to the various evidentiary rulings Met challenges, although in reaching that decision we abandon our prior gloss on the Utah Rules of Evidence that had implemented a more stringent threshold for the admission of potentially gruesome photographs, (3) that the court did not err in declining to merge Met's convictions, and (4) that, even assuming Met's trial counsel provided ineffective assistance, counsel's performance did not prejudice Met. We therefore affirm Met's child kidnapping and aggravated murder convictions.

¶4 We conclude, however, that the district court erroneously treated life without parole as the presumptive sentence for Met's aggravated murder conviction. *See* UTAH CODE § 76-3-207.7 (2007). Accordingly, we remand the case for the limited purpose of permitting the district court to clarify what impact its misapprehension of the law had on its sentencing decision or for resentencing on the aggravated murder charge. Finally, we affirm the sentence of life in prison without parole for the child kidnapping conviction.

## BACKGROUND

¶5 On March 31, 2008, seven-year-old Hser Ner Moo (Victim) was reported missing. The next day, she was found dead in the

basement of a nearby apartment. Victim's body was badly injured, and there were indications that she had been sexually assaulted.

¶6 Victim and her family were refugees from Burma, now known as Myanmar. The Burmese civil war of the 1980s forced Victim's parents, who are ethnically Karen, to flee to a Thai refugee camp.[1] In 2007, Victim and her family were relocated from Thailand to the Salt Lake City apartment where they were living when Victim was killed.

¶7 In February 2008, Defendant Esar Met, also a Burmese refugee, was relocated to Salt Lake City and moved into the basement of an apartment in the same complex as Victim's family. Met, who was Burmese but not Karen, shared the apartment with four Karen roommates.

¶8 Met befriended Victim and her ten-year-old friend. The two girls would, on occasion, visit Met's apartment to play games and watch movies. Usually "other Karen kids" were also playing at the apartment when Victim was there, but on at least one occasion, Victim and her friend were alone with Met.

¶9 On March 31, 2008, Victim's father was at work, and her mother was at a dentist appointment. Victim's aunt testified that she last saw Victim around 1:00 p.m. A neighbor remembered seeing Victim walking in front of her apartment sometime between 11:30 a.m. and 1:00 p.m. traveling southbound in the direction of Met's apartment. A friend of Victim also testified that sometime after her "morning meal but [before her] afternoon meal," Victim came to her house to ask to play, but Victim's friend declined because she did not feel well.

¶10 Victim's mother returned from her appointment that afternoon and noticed that Victim was missing. Victim's family

---

[1] *See generally* HAZEL J. LANG, FEAR AND SANCTUARY: BURMESE REFUGEES IN THAILAND 82–86 (2002) (describing the large scale forced migrations from Burma to Thailand). The Karen people are an ethnic group who originate primarily from Burma and Thailand. The Karen are distinct from other ethnic groups living in this area, including the ethnic Burmese people. In addition to having a distinct culture and history, the Karen speak a unique language. *See Karen*, ENCYCLOPÆDIA BRITANNICA (May 27, 2016, 10:45 AM), https://perma.cc/7RNU-TBDE.

searched the apartment complex and the surrounding area for several hours. Sometime that evening, Victim's father went to Met's apartment and asked Met's roommates if they had seen Victim. The roommates responded that they had not. The police were contacted, and soon police officers and volunteers embarked on a large-scale search of the area.

¶11   On the evening of April 1, four FBI agents knocked on the door of Met's apartment. After the agents knocked for approximately ten minutes, one of Met's roommates answered. The agents identified themselves, indicated that they were searching for Victim, and asked if they could enter and search the apartment. One of the roommates indicated that the agents could search for Victim. Met's four roommates were in the apartment at the time, but Met was not.

¶12   Two agents began to search while two others stayed with the roommates. One of the roommates explained that Met resided in the apartment's basement. The roommate also volunteered that Met was not at home and that the roommates had not seen Met that day or the day before.

¶13 Agents first searched the three-level apartment's upstairs and main floors. The agents then proceeded to the basement, which could be accessed from the main floor by an open stairway that led to the basement's living room.[2] The basement consisted of a main room and three smaller rooms accessible from the main room: a bathroom, a furnace room, and a bedroom. The first agent to enter the basement testified,

> I was the first one down the stairs. And I got to the bottom of the stairs . . . and the wall there, as I recall, opens up from the floor as it goes down, so I could start to see into the room. But once I saw in the room,

---

[2] There was no door at the top or the bottom of the stairs leading to the basement. Met's roommates testified that they generally did not enter the basement of the apartment, but two roommates testified that all of the roommates had permission to go anywhere they wanted in the apartment. Those two roommates also indicated that they stored some items, including a bike and DVDs, in the basement and would occasionally enter the basement to retrieve them.

the first thing I noticed were these two larger brown spots.

. . . .

 So at first . . . I thought, well, that doesn't look good. But I thought well, maybe it could be some spilled substance or something, but it also, of course, struck me, that looks like dried blood.

. . . [Did] you notice anything else?

Yes, I noticed a couple of things. I noticed the—the bed. [The condition of the bed] didn't look normal to me. I also noticed other less prevalent blood spatters on the floor and blood drops. And then most significant to me, because it looked like blood, . . . was over against [the] wall.

. . . .

[The spots on the wall appeared to be] blood traveling, hitting the wall and then running straight down [the wall].

Two more agents confirmed what the first agent believed—that the spots on the carpet and wall appeared to be dried blood.

¶14 One agent left the basement to contact the coordinating police officer as two agents continued to search the basement. After a search of the bedroom uncovered no significant evidence, the agents made their way to the bathroom. An agent testified, "The [bathroom] door was a little bit ajar, not fully closed. So that's when I pushed it open. And as soon as I opened the door, I saw some blood splatter located immediately within the threshold walking to the bathroom." In the bathroom, an agent also discovered a plastic bag appearing "to be full of blood" and a pair of pink and black shoes that "[l]ooked like they belonged to a young girl." As the agent approached the bathroom's shower stall, he saw "the foot of a young person" and then, as he got closer, "the full body of a young female." The body was identified as Victim. She was wearing a pink jacket and pink skirt and was not wearing any underwear. "Her left wrist looked like it was broken in an awkward angle. And . . . her legs were positioned at her sides to fit her in the shower basin." The agent testified that she was cold to the touch. An EMT later determined that she had been "deceased for some time."

¶15 After discovering Victim, the agents talked to Met's roommates. An agent testified that the roommates "seemed very calm" and acted "[t]he same way they had been during the entire time of the interview . . . . Nobody was visibly nervous or concerned or overly interested in what [the agents] were doing." When asked about Met, one of Met's roommates told the agents that he believed Met was at his cousin's house in Cottonwood Heights and provided a phone number.

¶16 The record contains little evidence regarding Met's whereabouts on March 31, 2008. Sometime that day, Met boarded a bus to his aunt's house in Cottonwood Heights. Met's uncle testified that he unexpectedly ran into Met around 3:00 p.m. on March 31 when the uncle boarded a bus to return to his house from work. The uncle invited Met to his house.[3] That evening, Met received a phone call from one of Victim's neighbors asking whether he had taken Victim with him. Met apparently responded, "I didn't bring her with me" and "[S]he did not come with me." Met stayed the night of March 31 at his aunt's house. On April 1, the police arrested Met on suspicion of Victim's murder.

¶17 Officers drove Met to a police station where police interviewed him for more than two hours. The police engaged the assistance of someone they believed to be an FBI translator. However, the translator was neither from the FBI nor trained as a translator. Rather, he was an acquaintance of Victim's parents and Met's roommates. After seeing police officers in the apartment complex, the translator had asked the police if he could assist Victim's parents. An officer apparently responded that he could help by going to the police station and offering his assistance there. Although no problems were noted during the interview, a later review of the transcript revealed that there had been significant translation errors. In the words of one of the interviewing officers, "The translation was not correct. The information I thought I was getting from the defendant was not the same as was relayed to me. And the stuff I was relaying to the defendant was not getting relayed to him as I said it in any way." During that interrogation, Met

---

[3] Met's aunt and uncle both testified that they did not know that Met was going to come to the house that day and that there were no standing plans, but they did state that they had previously told Met that he was welcome to visit their house anytime.

confessed to killing Victim accidentally, but denied that he had sexually assaulted her.[4]

¶18 Met was eventually charged with aggravated murder and child kidnapping. The State did not seek the death penalty. Met moved to suppress all evidence gathered in, or stemming from, the search of his apartment. He argued that the warrantless search of his apartment violated the Fourth Amendment. The district court denied Met's motion, concluding that the warrantless search of the apartment was reasonable because Met's roommates consented to the search of the common areas of the apartment, including the basement's main room and bathroom. The court also concluded that once officers discovered blood stains in the main room of the basement, they were permitted to search the basement bathroom due to the "exigencies of the situation."

¶19 Met also moved to suppress his interview with the police because he was not informed of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and because there were "significant deficiencies in the interpretation [provided] during the interview." The State conceded that it could not use Met's interview testimony in its case in chief because the translator had not adequately advised Met of his *Miranda* rights. The court concluded that the State could not use Met's testimony in its case-in-chief but authorized the use of Met's statements for impeachment purposes if Met chose to testify.

¶20 Met moved to exclude three photographs as gruesome and unduly prejudicial. The district court denied the motion with respect to two of the photographs. One photograph shows Victim "lying

---

[4] The interrogation was conducted at the police station and later translated verbatim by the FBI. According to the FBI translation of Met's interrogation, Met's translator implored Met as a Burmese "brother" not to lie and to tell the truth about what happened. In response, Met said, "It could say accident. They can believe however they want . . . . I killed her. I am telling the truth." Later in response to the question "Did you kill her?" Met confessed, "Yeah, I have to say that I killed her. How am I supposed to say? She died because of me." When asked whether he had also sexually assaulted Victim, Met replied that "[i]t is true that this child is dead because of me but I did not ruin the child. I am telling the truth. I swear." He maintained throughout the interview that the killing was accidental and that he had not sexually assaulted Victim.

face down in a shower stall." The court determined that this photograph was "highly probative" of the injuries Victim sustained, the location and position of her body, including that she was not wearing underwear and that her body had been washed, and the "struggle" that took place surrounding her murder. The second photograph is a "clean, close-up shot of [Victim's] genitalia." The court determined that the photograph was relevant to and probative of the question of whether Met had sexually assaulted Victim.

¶21 At trial, the State presented the testimony of Dr. Todd Grey, chief medical examiner for the State and a forensic pathologist, who had performed Victim's autopsy. He testified that "[t]he majority of the injuries . . . were . . . blunt force injuries. So they would be things like contusions or bruises, abrasions or scrapes, lacerations or tears in the skin, as well as a fracture . . . of the left—distal left arm." Victim suffered injuries to her cheek, her chin, and her neck; an abrasion and bruising around her left temple; a complete fracture of her "two bones of the [left] forearm"; petechiae in her eyes— hemorrhages "very commonly associated with asphyxia"—likely in this instance due to "clothing being twisted tightly across the front of her neck"; numerous injuries to her chest, which caused "the tissues of th[e] central structure of her chest" to be pulled away "or sheared off" of her spinal column; and a fatal tear in the right atrium of her heart caused by blunt force trauma to her body. Dr. Grey opined that Victim's death was a homicide, "as a result of blunt force injuries" to her "neck, her torso and her left wrist."

¶22 The State also called Dr. Lori Frazier to the stand. Dr. Frazier testified that Victim also suffered "some type of penetrating injury that damaged the tissues in the upper part of the hymen and the anterior vaginal wall."

¶23 The State presented DNA evidence collected from the denim jacket Met was wearing when he was taken into custody. A forensic scientist, Chad Grundy, found that the two blood stains he tested "appeared to have originated from a single female source." Grundy's testing also established that the blood on Met's jacket matched Victim's DNA.[5] The State also collected and tested DNA evidence found under Victim's fingernails. The tests excluded Met's

---

[5] The tested blood samples from the denim jacket were "clean sample[s]," meaning that they identified only a single DNA contributor and not a mixture of two DNA samples.

roommates as the DNA's source but could not exclude Met or the men in Victim's family.

¶24 Grundy testified that he had also tested several stains found in Met's apartment. He found human blood present in the two stains on the carpet of the basement's main floor, in the stain on the wall in the basement's main room, in the stains in the basement's bathroom, and in two stains in the stairwell leading to the basement. Grundy also found that a stain in the living room on the apartment's main floor, around the corner from the staircase leading to the basement, tested positive as human blood. DNA obtained from four of these stains matched Victim's. Additionally, Victim could not be excluded as the DNA contributor to the main-floor blood stain.

¶25 Met had various injuries on his body that were consistent with scratching or the "scraping or . . . clawing of a fingernail." One particular abrasion on the inside of Met's thigh consisted of three streaks, twelve millimeters in length, with each streak parallel to the other. Many of these injuries were sustained in areas such as Met's thigh, hip, and right calf that would ordinarily have been covered by Met's underwear or pants. A nurse testified that many of the injuries, because of their location and severity, were likely made when Met was not wearing either underwear or pants, although the nurse conceded that it was possible to sustain similar abrasions when clothed.

¶26 On the eighth day of trial, the State informed the district court and Met's counsel that it had "just become aware of" "potential[ly] exculpatory testimony." The prosecutor indicated that it had "been his understanding . . . that there was . . . no blood of any sort upstairs." The prosecutor testified that, contrary to his belief, the previous evening a crime scene investigator "indicated that there was a spot of blood that they found on the carpet" of the top floor of the apartment. The prosecutor learned that the investigator had performed a preliminary test on the spot, which indicated that the spot was likely blood. The investigator and his team apparently did no further testing and declined to preserve that evidence because they believed the upstairs "was not relevant to the crime scene." The prosecutor stated that this was the first time he had learned of the

potential blood spot and that he believed, prior to the discussion, that the spot was betel-nut residue.[6]

¶27 Met's trial counsel indicated that he was disappointed that the spot had not been preserved and tested because it "could have changed the case dramatically," but stated that he would "explore the [decision not to test the spot] the best we can on cross [examination] with this late notice." In the midst of counsel's cross-examination of the crime scene investigator, counsel asked the court to grant a mistrial based on the State's failure to identify and preserve the potential blood spot. Later in the day and before the court had an opportunity to rule, Met's trial counsel withdrew the mistrial motion, explaining to the court that he did not believe he could establish prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83 (1963). Met's trial counsel stated that he "spent the lion's share[7] of today on the computer. I've done actually three separate analyses under three separate lines of cases . . . ." Met's counsel testified that his research indicated that he could not meet his burden of demonstrating the need for a mistrial and so he did not think the motion was "well taken."

¶28 The jury found Met guilty of aggravated murder and child kidnapping. The jury found three aggravating circumstances that classified Victim's killing as aggravated murder. First, the "homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which the defendant committed or

---

[6] A betel nut is a tree nut chewed by users that has a stimulating effect equivalent to six cups of coffee. It is "believed to be one of the most popular mind-altering substances in the world." Cindy Sui & Anna Lacey, *Asia's Deadly Secret: The Scourge of the Betel Nut*, BBC NEWS (Mar. 22, 2015), http://www.bbc.com/news/health-31921207.

[7] This expression derives from one of Æsop's fables. The fable describes a hunting partnership between a lion, fox, jackal, and wolf. When the four were ready to share their spoils, the lion split the stag into four equal parts. The lion then stated, "I am King Lion . . . . so of course I get the first part. This next part falls to me because I am the strongest; and this is mine because I am the bravest." Stretching his claws, the lion finished, "If any of you have any claim to the part that is left, . . . now is the time to speak up." *The Lion's Share*, LIBRARY OF CONGRESS, http://www.read.gov/aesop/141.html (last visited May 3, 2016).

attempted to commit sexual abuse of a child." Second, the "homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which the defendant committed or attempted to commit child abuse." And third, Victim was younger than fourteen years of age. The jury also found that in the course of the child kidnapping, Met caused "serious bodily injury" to another, an aggravating sentencing factor for child kidnapping.

¶29 Met moved to merge his child kidnapping conviction with his aggravated murder conviction. Met argued that "there was simply no evidence adduced at trial of any detention or confinement independent from the detention inherent in the commission of the aggravated homicide." The district court denied Met's motion to merge the two convictions. It concluded "that the jury had sufficient evidence to support a separate conviction on the child kidnapping count in addition to the aggravated murder count."

¶30 Met also asked the court to declare Utah's noncapital aggravated murder sentencing statute unconstitutional. *See* UTAH CODE § 76-3-207.7 (2007). He contended that the statute violated, among other constitutional provisions, the Equal Protection Clause and the Due Process Clause by granting the sentencing court unfettered discretion in its sentencing decision, which could lead to arbitrary sentencing. The district court denied Met's motion.

¶31 The court pronounced two sentences of life in prison without parole for Met's aggravated murder and child kidnapping convictions. The court ordered the sentences to run concurrently. At the sentencing hearing, the court opined that there was a presumptive life sentence for both Met's aggravated murder conviction and the child kidnapping conviction aggravated by the serious-bodily-injury finding.

¶32 Met appeals. We have jurisdiction under Utah Code section 78A-3-102(3)(i).

## ISSUES AND STANDARDS OF REVIEW

¶33 Met's various constitutional and statutory arguments attacking his sentence under Utah Code section 76-3-207.7 and Utah's sentencing structure for those convicted of aggravated murder are questions of law that we review for correctness. *See State v. Reece*, 2015 UT 45, ¶ 18, 349 P.3d 712; *State v. Perea*, 2013 UT 68, ¶ 34, 322 P.3d 624. We afford no deference to the district court's legal conclusions. *Perea*, 2013 UT 68, ¶ 34.

¶34 The district court's denial of Met's motion to suppress the transcript of the police interrogation is a mixed question of law and fact, where our review is "sometimes deferential and sometimes not." *State v. Arriaga-Luna*, 2013 UT 56, ¶ 7, 311 P.3d 1028 (citation omitted). We recently explained that the deference we afford the district court's resolution of a mixed question depends upon

> (1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application of the legal rule relies on "facts" observed by the trial judge, such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (3) other policy reasons that weigh for or against granting [deference] to trial courts.

*Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 36, 308 P.3d 461 (alteration in original) (citation omitted). A question is more law-like if it "lend[s] itself to a consistent resolution by a uniform body of appellate precedent." *Id.* ¶ 37 (citation omitted). A question is more fact-like if "the trial court is in a superior position to decide it." *Id.* (citation omitted). Here, for example, where the district court's decision is "based entirely on its review of the interrogation transcripts and the court's interpretation of the law," the question is more law-like than fact-like. *Arriaga-Luna*, 2013 UT 56, ¶ 8. "[W]e owe the district court no deference" when "we are in as good a position as the district court to examine the transcripts and determine what the law is." *Id.* We thus owe the district court no deference in considering the denial of Met's motion to suppress the transcript of the police interrogation. We review the court's decision for correctness. *See Murray*, 2013 UT 38, ¶¶ 36–40.

¶35 Met's contention that the district court erred in denying his motion to suppress evidence gathered in alleged violation of his Fourth Amendment rights also presents "a mixed question of law

and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. "While the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case." *Id.*

¶36 We review Met's challenge to the admission of allegedly gruesome photographs for an abuse of the district court's discretion. *State v. Bluff*, 2002 UT 66, ¶ 47, 52 P.3d 1210; *see also State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981; *State v. Gulbransen*, 2005 UT 7, ¶ 35, 106 P.3d 734 ("The trial court's ultimate ruling under rule 403 of the Utah Rules of Evidence is reviewed for an abuse of discretion.").

¶37 The district court's refusal to merge Met's child kidnapping conviction into his aggravated murder conviction is a mixed question of law and fact that is more law-like than fact-like. In reviewing whether the district court erred in merging or refusing to merge the convictions, the facts this court relies upon are of the sort that are "adequately reflected in the record," not the sort "observed by the trial judge." *Murray*, 2013 UT 38, ¶ 36 (citation omitted). We thus review the district court's merger ruling for correctness. *See State v. Lee*, 2006 UT 5, ¶ 26, 128 P.3d 1179.

¶38 Last, "[a] claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law" that we review for correctness. *State v. Lucero*, 2014 UT 15, ¶ 11, 328 P.3d 841 (citation omitted).

## ANALYSIS

### I. Utah Code Section 76-3-207.7 Is Not Constitutionally Deficient

¶39 Met argues that Utah Code section 76-3-207.7 violates the federal and Utah Due Process Clauses, the federal Equal Protection Clause, Utah's uniform operation of laws clause, the federal and state Cruel and Unusual Punishment Clauses, and his right to a trial by jury under the federal and state constitutions.

¶40 The Utah Code provides a dual-track structure for those charged with aggravated murder. Under Utah Code section 76-5-202(3)(a), if the prosecutor files a notice of intent to seek the death penalty, the aggravated murder is charged as a "capital felony." Alternatively, if the prosecutor does not file a notice of intent to seek the death penalty, then the aggravated murder is charged as a "noncapital first degree felony." *Id.* § 76-5-202(3)(b).

¶41 Defendants who are convicted of aggravated murder as a capital felony—who are facing the possibility of death—are

sentenced by a jury, or, if the defendant requests and the State consents, by a court. *See* UTAH CODE § 76-3-207(1)(c) (2007).[8] The sentence may be death only if a unanimous jury agrees. *Id.* § 76-3-207(5)(a). If jurors do not unanimously agree to impose the death sentence, the statute provides for a sentence "of either an indeterminate prison term of not less than 20 years and which may be for life" or for "life in prison without parole." *See id.* Life in prison without parole, however, may be imposed under section 76-3-207 only if ten or more jurors agree. *See id.* § 76-3-207(5)(c). Section 207 contains a non-exhaustive list of aggravating and mitigating circumstances for the jury or judge to consider to decide whether to impose a death sentence. *See id.* § 76-3-207(3)–(5). The statute also provides a non-exhaustive list of evidence that may be presented at sentencing. *See id.* § 76-3-207(2).

¶42 Defendants who, like Met, are convicted of aggravated murder as a noncapital first degree felony—and who are not facing the possibility of death—are sentenced under Utah Code section 76-3-207.7. *See id.* § 76-3-207.7 (2007). Under that section, the sentencing court may impose one of two sentences: life in prison without parole or an indeterminate prison term of twenty years to life. *Id.* § 76-3-207.7(2). The statute does not provide any additional direction to guide the court, i.e., it   does not require ten jurors to agree to a sentence of life in prison without the possibility of parole. We have stated, however, that the statute should "be read in the context of other provisions mandating that the criminal code 'shall be construed . . . [to p]revent arbitrary and oppressive treatment' and to impose 'penalties which are proportionate to the seriousness of offenses.'" *State v. Reece*, 2015 UT 45, ¶ 78, 349 P.3d 712 (alterations in original) (citation omitted).

¶43 In short, the statutory protections for those who face a potential death sentence differ from those who do not. The bulk of Met's constitutional challenges center on the different level of protections afforded to those sentenced under the noncapital

---

[8] We apply the sentencing statutes in effect at the time of Met's killing of Victim in 2008. However, we note that the minimum sentence for both capital and noncapital first degree felony aggravated murder has since been increased to imprisonment of twenty-five years to life. *See* UTAH CODE §§ 76-3-206(1), 76-3-207.7(2) (2016).

aggravated murder sentencing statute—Utah Code section 76-3-207.7.[9] Met contends that his sentencing under Utah Code section 76-3-207.7 violates various constitutional provisions. Many of Met's arguments, although repackaged in various ways, have been resolved by this court. And Met has not sustained the heavy burden required to convince us to abandon our precedent. *See State v. Menzies*, 889 P.2d 393, 398 (Utah 1994) ("Those asking us to overturn prior precedent have a substantial burden of persuasion."). We therefore reject, on stare decisis grounds, Met's argument that section 76-3-207.7 is unconstitutional under the Utah Constitution's uniform operation of laws provision. *See Reece*, 2015 UT 45, ¶¶ 77–80; *State v. Perea*, 2013 UT 68, ¶¶ 121–23, 322 P.3d 624. We similarly reject his challenge that section 76-3-207.7 violates the Eighth Amendment's prohibition on cruel and unusual punishment. *See Reece*, 2015 UT 45, ¶ 80; *Perea*, 2013 UT 68, ¶¶ 125–27. We also reject his argument that section 76-3-207.7 violates the right to a trial by

---

[9] In addition to his specific arguments, Met asks us to import constitutional and statutory protections necessary to impose the death penalty to life in prison without parole sentencing determinations because "the death penalty is to [life without parole] as [life without parole] is to all other sentences." We, along with many other courts, have long recognized that the death penalty is qualitatively different from a prison sentence, even one as serious as life in prison without parole. *See Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (setting out the "qualitative difference between death and all other penalties" and declining to impute constitutional protections for death penalty sentencing to any other sentencing); *State v. Griffin*, 2016 UT 33, ¶ 17 n.4, --- P.3d --- (explaining that our "sua sponte prerogative" to correct certain unpreserved errors "is limited to capital cases where the death penalty was imposed" (citation omitted)); *State v. Houston*, 2015 UT 40, ¶ 36, 353 P.3d 55 (concluding that the death penalty, because of its "finality," differs from a sentence of imprisonment, and creates a "need for reliability in the determination that death is the appropriate punishment in a specific case" (citation omitted)). Met offers no argument that this court has not already addressed, and he has not shouldered his burden of convincing us that our precedent should be overturned.

jury under the Fifth and Sixth Amendments. *See State v. Houston*, 2015 UT 40, ¶¶ 30–32, 353 P.3d 55.[10]

¶44 We have not previously addressed whether section 76-3-207.7 violates the prohibition against cruel and unusual punishment found in article I, section 9 of the Utah Constitution or whether it violates a defendant's state constitutional right to a jury trial under article I, section 10 of the Utah Constitution. Although Met invokes these state constitutional provisions, he does not develop an argument based upon them, preferring to append them to arguments based upon their federal counterparts. As we have explained, "cursory references to the state constitution within arguments otherwise dedicated to a federal constitutional claim are inadequate." *State v. Worwood*, 2007 UT 47, ¶ 18, 164 P.3d 397. "When parties fail to direct their argument to the state constitutional issue, our ability to formulate an independent body of state constitutional law is compromised. Inadequate briefing denies our fledgling state constitutional analysis the full benefit of the interested parties' thoughts on these important issues." *Id.* While Met has stated that section 76-3-207.7 violates two Utah constitutional provisions, he offers us no "distinct legal argument or analysis" to support his assertion. *Id.* ¶ 19. We therefore leave those arguments for a matter in which they are thoroughly briefed.

¶45 Met also argues that Utah Code section 76-3-207.7 violates the state and federal Due Process Clauses by delegating legislative power without "minimum guidelines" to govern sentencing. Article V, section 1 of the Utah Constitution prohibits the Legislature from

---

[10] Met also argues that we should invoke the rule of lenity to reverse the sentence imposed by the sentencing court. "The rule of lenity requires that we interpret an ambiguous statute in favor of lenity toward the person charged with criminal wrongdoing." *State v. Rasabout*, 2015 UT 72, ¶ 22, 356 P.3d 1258. The rule of lenity is not implicated by a statute unless the statute is ambiguous. *Id.* A statute is ambiguous only when "its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis." *Id.* (citation omitted). Utah Code section 76-3-207.7 requires the district court to sentence the defendant to either an indeterminate term-of-years sentence of not less than twenty years *or* to life in prison without parole. *See* UTAH CODE § 76-3-207.7 (2007). Although ambiguous options may exist in the code, an option in and of itself is not an ambiguity.

"delegating 'core' or 'essential' legislative power or functions," including the "definition of a crime and the precise punishment therefor." *State v. Briggs*, 2008 UT 83, ¶ 14, 199 P.3d 935 (citations omitted). Furthermore, a law may violate federal due process by failing to "establish minimal guidelines" to guide the enforcement of the statute. *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

¶46 Section 76-3-207.7 does not unconstitutionally delegate legislative power or violate the federal Due Process Clause by failing to establish minimum guidelines. As we have explained, section 76-3-207.7, while relatively terse, "must be read in the context of other provisions mandating that the criminal code 'shall be construed . . . [to p]revent arbitrary and oppressive treatment' and to impose 'penalties which are proportionate to the seriousness of the offenses.'" *Reece*, 2015 UT 45, ¶ 78 (alterations in original) (citation omitted). Before a sentencing court imposes a sentence under section 76-3-207.7, it must "consider all the evidence before it—the totality of the circumstances—[and impose] a sentence that is proportionate to the crime and the culpability of the defendant." *Id.* (alteration in original) (citation omitted).

¶47 Section 76-3-207.7 outlines the precise punishments available and requires the sentencing court to consider all applicable circumstances and evidence prior to its imposition of a sentence. Met's contention that section 76-3-207.7 grants unfettered discretion to the sentencing court runs contrary to our established precedent requiring the sentencing court to consider all relevant evidence. *See Reece*, 2015 UT 45, ¶¶ 78–79; *Perea*, 2013 UT 68, ¶¶ 110–19; *cf. Williams v. New York*, 337 U.S. 241, 247, 251 (1949) (concluding that a sentencing judge's "broad discretionary power" in reviewing information in making a sentencing decision, including reviewing out-of-court information, does not violate the federal Due Process Clause and reasoning that "modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain [all] pertinent information").[11]

---

[11] Met also suggests due process and equal protection violations spring from the "unfettered" discretion the statute affords prosecutors to decide whether to charge aggravated murder as a capital or noncapital offense. Met's suggestion, unaccompanied by analysis or citation to case law, does not brief the issue adequately.

(continued . . .)

¶48 Met's final constitutional argument questions whether the dual-track sentencing structure violates equal protection principles. "The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *State v. Lafferty*, 2001 UT 19, ¶ 70, 20 P.3d 342 (quoting U.S. CONST. amend. XIV, § 1). "Thus, state laws must 'treat similarly situated people alike unless a reasonable basis exists for treating them differently.'" *Id.* (citation omitted). Put another way, "[b]oth the federal and state constitutions require that similarly situated individuals be treated alike under the law unless there is a reasonable basis for treating them differently." *State v. Herrera*, 895 P.2d 359, 368 (Utah 1995). Met does not argue that the statute violates any "fundamental right or makes determinations based on any suspect classification." *See Lafferty*, 2001 UT 19, ¶ 71. Thus, to survive constitutional scrutiny, the sentencing statute "need be only rationally related to a valid public purpose." *See id.*; *see also Chapman v. United States*, 500 U.S. 453, 465 (1991) (reviewing an equal protection challenge to a sentencing statute for "a rational basis"); *United States v. Titley*, 770 F.3d 1357, 1359 n.3 (10th Cir. 2014) ("Our cases also support rational basis review of equal protection challenges in the sentencing context."); *McQueary v. Blodgett*, 924 F.2d 829, 834 (9th Cir. 1991) (concluding that in the face of an equal protection challenge, a review of a sentencing system where two sets of prisoners were sentenced under two separate statutes was reviewed for "a rational relation to [a] governmental purpose"); *Jones-El v. Grady*, 54 F.App'x 856, 857 (7th Cir. 2002).

¶49 Met contends that section 76-3-207.7 treats a class of similarly situated individuals—those convicted of aggravated murder—differently by allowing some to be sentenced to life in prison without parole while allowing others to be sentenced to "the lighter sentence of twenty years to life." We have recognized that criminal defendants convicted of the same crime are not necessarily similarly situated. *Perea*, 2013 UT 68, ¶ 123 ("Not all those found guilty of aggravated murder are similarly situated."). Our sentencing scheme requires the district court to consider and weigh all relevant evidence when sentencing a defendant. *See Reece*, 2015 UT 45, ¶¶ 79,

*See State v. Nelson*, 2015 UT 62, ¶ 39, 355 P.3d 1031 (stating that we require "not just bald citation to authority but development of that authority and reasoned analysis based on that authority" (citation omitted)).

84. This individualized inquiry means that a court, prior to sentencing, will have recognized that "each case and each defendant presents a different set of facts and a different combination of aggravating and mitigating factors" and that therefore not all persons convicted of murder are similarly situated to one another. *Perea*, 2013 UT 68, ¶ 123. Offering a sentencing judge a range of options serves a valid public purpose by acknowledging that, while defendants may be charged with similar or even identical crimes, not every defendant arrives at the steps of the courthouse via the same path. The Legislature promotes a valid public interest in creating a structure that permits a judge to consider the "different set of facts and a different combination of aggravating and mitigating factors," *id.*, in sentencing each defendant, so that each defendant is treated on an individual basis. As we noted in another context,

> [w]hile all [defendants found guilty of aggravated murder] are found guilty of the same crime, each case and each defendant presents a different set of facts and a different combination of aggravating and mitigating factors. The discretion afforded to district courts furthers the legitimate legislative purpose of sentencing offenders based on the totality of the unique circumstances present in each case. District courts are authorized and empowered by the Legislature to review the totality of the circumstances before imposing a sentence.

*Id*. "Therefore, because the discretion given to district courts furthers the legitimate legislative purpose of sentencing offenders based on the severity of their particular circumstances, we hold that section 76-3-207.7 does not violate" equal protection principles. *Id*.

¶50 Met also contends that section 76-3-207.7 treats similarly situated defendants differently in allowing some defendants to be sentenced under section 76-3-207.7 while others are sentenced under section 76-3-207. Met correctly asserts that these two groups of defendants are similarly situated in that they are all charged with the crime of aggravated murder. But, he argues, they are treated differently in the end because capital defendants are sentenced by a jury under a statute with additional sentencing guidelines and requirements due to the potential imposition of the death penalty and non-capital defendants are sentenced by a judge under a statute that provides no additional guidelines or requirements. *Compare* UTAH CODE § 76-3-207, *with* § 76-3-207.7.

¶51 There is a clear difference, however, between defendants sentenced under these two statutes. While both groups may be charged with committing similar crimes, they are not similarly situated: defendants sentenced under section 76-3-207 face a potential death sentence whereas defendants sentenced under section 76-3-207.7 do not. The Legislature has a reasonable basis for treating each group of defendants differently. To overcome the Eighth Amendment's prohibition on cruel and unusual punishments, the Legislature is constitutionally required to impose a detailed process that safeguards against "a substantial risk that [the death penalty] would be inflicted in an arbitrary and capricious manner" before a defendant can be sentenced to death. *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (discussing *Furman v. Georgia*, 408 U.S. 238 (1972)). Utah Code section 76-3-207 is designed to satisfy this requirement. The Eighth Amendment does not require the same level of protection for defendants facing the possibility of life imprisonment without parole. *See Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (providing that individualized sentencing is required for capital cases, but declining to extend it to any other sentence because "even where the difference is the greatest, [those sentences] cannot be compared with death"). Because the death penalty is different, in both a factual and legal sense, from life without parole, the Legislature has a reasonable basis for treating those facing the death penalty differently than those who are not. Met has failed to demonstrate that section 76-3-207.7 violates the federal Equal Protection Clause.[12]

¶52 We conclude that Utah Code section 76-3-207.7 and Utah's dual-track sentencing structure for those convicted of aggravated

---

[12] At oral argument, Met's counsel defined an additional class of defendants: those who were charged with aggravated murder as a capital offense but were not sentenced to death. Met posits that there is a period of time—after the jury rejects the death penalty but is still deliberating whether to impose life without parole—when a defendant is similarly situated to a defendant charged with non-capital aggravated murder. Even assuming that the class could be parsed this finely, the Legislature would have a rational basis for treating the defendants differently. At the moment of time Met describes, the additional protections the defendant receives are those that flow from the decision to seek the death penalty in the first instance.

murder do not violate the various federal and state constitutional provisions Met raises.

### II. To Successfully Challenge the District Court's Decision to Allow the Interview Transcript to Be Used for Impeachment Purposes, Met Needed to Either Testify or Create a Record of What His Testimony Would Have Been

¶53 Met next argues that the district court erred by ruling that the transcript of his police interview, though inadmissible for the State's case-in-chief, was admissible for impeachment purposes. While the transcript was not actually used at trial because Met declined to testify, Met contends that the court's allegedly erroneous decision tainted the proceedings by discouraging him from testifying.

¶54 It is undisputed that Met's interview was inadmissible as part of the State's case-in-chief because the translator assisting the interviewing agents grossly misinterpreted the *Miranda* warning given to Met prior to his interrogation.[13] Despite this, the State asked the court to rule that the transcript was admissible for impeachment purposes should Met testify at trial. *See Harris v. New York*, 401 U.S. 222, 223 (1971). Under *Harris*, testimony may be admissible for impeachment purposes, even if no *Miranda* warning was given, if the statements were given voluntarily and "the trustworthiness of the evidence satisfies legal standards." *Id.* at 223–24.

¶55 After reviewing a video recording of the interview and a transcript, the district court ruled that the transcript could be admitted for impeachment purposes because "[Met's] statements to the officers were voluntary." The court reasoned that the interrogation did not employ the types of coercive interrogation techniques that could lead to the conclusion that testimony was not freely given. For example, the district court noted that the interview lasted less than two-and-a-half hours; that the interrogation "techniques used by the officers in this case did not create a coercive

---

[13] For example, in the midst of translating the list of *Miranda* rights, the translator informed Met "As for you, you have to tell the truth," and "you have the right to tell the facts as you know." In another exchange, the interrogating officer asked the translator to tell Met, "we want to get your side of the story," but the translator told Met, "They are going to start and tell a new little story."

environment that overcame [Met's] will"; that the officers were not unreasonably persistent; that the "interpretation problems, although pervasive throughout the interview," were not coercive and did not cause Met to make incriminating statements; and that Met demonstrated a calm demeanor throughout the interview.

¶56 Met argues that his statements were not voluntary. He also argues that the circumstances surrounding his interview were too untrustworthy to allow the transcript to be used as impeachment evidence. The State disputes Met's substantive argument and also contends that we should decline to review the district court's decision to admit Met's interview for impeachment purposes because Met did not preserve the argument. The State argues that we should consider Met's argument unpreserved "because he never took the stand and the statements were never used against him."

¶57 The State correctly notes that we have endorsed the United States Supreme Court's holding in *Luce v. United States* and have therefore, in the past, required defendants to testify to preserve a challenge to an evidentiary ruling.[14] *See State v. Gentry*, 747 P.2d 1032, 1036 (Utah 1987); *Luce v. United States*, 469 U.S. 38, 41–43 (1984). *Luce* concluded that to preserve a claim that the district court had erred by ruling that the defendant could be impeached with evidence of a prior conviction, the defendant needed to take the stand. *Luce*, 469 U.S. at 43; *see also id.* at 41 ("A reviewing court is handicapped in any effort to rule on subtle evidentiary questions

---

[14] We, and many other courts, speak of this requirement to testify in terms of preservation. Preservation appears to be an inapt label. Here, for example, Met preserved his argument in the normal meaning of our preservation rules by moving the court to suppress the transcript for all purposes and by specifically responding to the State's argument that the transcript should be allowed for impeachment. This satisfies the concerns that animate our preservation rules, including promoting judicial economy by affording the trial court the opportunity to address the alleged error and foreclosing the ability to create a tactical advantage by foregoing an objection with hopes of creating an issue for appeal. *See State v. Larabee*, 2013 UT 70, ¶ 15, 321 P.3d 1136. The problem here is not lack of preservation but rather the lack of a record to assess whether the alleged error would, in actuality, have had any impact on the outcome of the trial. To remain consistent with the body of case law on this topic, we will continue to refer to this as a preservation issue.

outside a factual context."). The United States Supreme Court reasoned that if the defendant had testified, the "Court of Appeals would then have had a complete record detailing the nature of petitioner's testimony, the scope of the cross-examination, and the possible impact of the impeachment on the jury's verdict." *Id.* at 41. The court also noted that when "the defendant does not testify, the reviewing court also has no way of knowing whether the Government would have sought to impeach with the prior conviction." *Id.* at 42. It thus declined to offer Luce a new trial when it had no way of knowing if and how the lower court's ruling impacted Luce's trial.

¶58 We adopted *Luce* in *Gentry*, 747 P.2d at 1036. We were persuaded by "the rationale and holding of *Luce*," that requiring a defendant to testify to preserve the claim "will enable the reviewing court to determine the impact any erroneous impeachment may have had in light of the record as a whole; it will also tend to discourage making such motions solely to 'plant' reversible error in the event of conviction." *Id.* (quoting *Luce,* 469 U.S. at 42).

¶59 We have not yet had the opportunity to consider whether to extend this requirement to cases where the underlying objection to the impeachment evidence focuses on a claim that a confession was elicited in violation of the defendant's constitutional rights. Many courts have found this distinction significant. Picking up on language in *Luce* that suggests the United States Supreme Court ruled on an issue that "dealt with a preliminary ruling 'not reaching constitutional dimensions,'" the Ninth Circuit Court of Appeals concluded that *Luce*'s reasoning did not apply to a claim that use of an involuntary confession for impeachment violated the defendant's constitutional rights. *See United States v. Chischilly*, 30 F.3d 1144, 1150–51 (9th Cir. 1994) (citation omitted) *overruled on other grounds by United States v. Preston*, 751 F.3d 1008, 1019–20 (9th Cir. 2014). Several other courts have reached similar conclusions. *See, e.g.*, *State v. Brings Plenty*, 459 N.W.2d 390, 394 (S.D. 1990) ("*Luce* does not stand for the proposition that Fifth Amendment confession issues are waived if a defendant does not take the stand."); *State v. Brunelle*, 534 A.2d. 198, 204 (Vt. 1987) ("*Luce* is not controlling because, in contrast to the case at bar, it did not involve constitutionally suppressed evidence."); *People v. Henderson*, 745 P.2d 265, 266 (Colo. App. 1987) ("Where, as here, the admissibility of a prior felony conviction is challenged on constitutional grounds, a defendant is not required to testify at trial to preserve the issue for review.").

¶60 Other courts have found the distinction to be far less compelling. A divided Michigan Supreme Court reasoned that "every case in which a defendant alleges that a trial court's ruling effectively prevented him from testifying" presents "constitutional implications." *People v. Boyd*, 682 N.W.2d 459, 464 (Mich. 2004). Relying, in part, on a number of the considerations that motivated the *Luce* court—difficulty in evaluating the impact of a trial court's ruling in a vacuum, and the potential for a defendant to abuse the structure—the Michigan Supreme Court extended *Luce*'s reach to alleged errors "implicating a defendant's Fifth Amendment privilege against self-incrimination." *Id.* at 466. Arizona and other states similarly extended *Luce. See, e.g., State v. Conde*, 846 P.2d 843, 848 (Ariz. Ct. App. 1992) ("All of the policy reasons for declining to consider his claim in the absence of his testimony apply whether his statement was coerced or . . . obtained in violation of *Miranda*."); *see also Wagner v. State*, 347 P.3d 109, 111, 116 (Alaska 2015) (concluding that "by declining to testify," a defendant "failed to preserve his *Miranda* claim for appellate review"); *Jordan v. State*, 591 A.2d 875, 878 (Md. 1991) ("Although *Luce* involved the issue of impeachment by prior conviction rather than a ruling grounded on a constitutional right not to be impeached with an involuntary confession, we are persuaded that its reasoning is applicable in the instant case.").

¶61 We can understand the split in decisions. It is incongruous to require a defendant to testify to preserve an argument that she has a right to remain silent. But the concerns that caused us to adopt *Luce* in *Gentry* apply equally in cases involving Fifth Amendment claims. It is difficult to review and assess the impact of an allegedly erroneous evidentiary ruling where there is no record of how the alleged error impacted the case. Here, for example, even assuming that the district court erred in ruling that the interview transcript could be used for impeachment, we cannot know whether, but for that error, Met would have testified or that Met would have testified inconsistently with his interview. *See Luce*, 469 U.S. at 42 ("[A]n accused's decision to testify 'seldom turns on the resolution of one factor'" and "a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify." (citation omitted)). Nor can we assess how that testimony, whatever it might have been, would have changed the evidentiary picture presented to the jury. *Id.* ("Even if these difficulties could be surmounted, the reviewing court would still face the question of harmless error.").

¶62 These competing concerns cause us to take a different approach. We do not impose *Luce's* bright-line rule requiring a

defendant to testify in order to preserve a claim that a district court improperly ruled that testimony was procured in violation of a defendant's Fifth Amendment rights. But neither will we assume that the alleged error must have been harmful in the absence of a record to review. Instead, if a defendant chooses not to testify after the district court finds her statements admissible for impeachment, in order to present a persuasive argument on appeal, that defendant must, by some means, create and present a record in the district court sufficient to permit meaningful appellate review. A defendant who does not wish to testify could, for example, have counsel proffer—or provide affidavits—to create a reviewable record.[15]

¶63  Met cannot point us to anything in the record that suggests he would have testified and that his testimony would have provoked impeachment by his prior interview. Nor has he shown us how that testimony and imagined impeachment would have changed the evidentiary landscape. Because we cannot assess the impact of the district court's alleged error in declaring his interrogation transcript admissible for impeachment purposes, we decline to review the substance of that decision.[16]

---

[15] We recognize that the *Luce* court rejected the possibility of creating a record by proffer out of a concern that the "trial testimony could, for any number of reasons, differ from the proffer." *Luce*, 469 U.S. at 41 n.5. We acknowledge that concern. However, in balancing a defendant's Fifth Amendment rights against the potential for an inconsistent proffer, we believe that allowing counsel to create a record by proffer strikes the better balance by intruding less upon a defendant's Fifth Amendment rights. We also trust counsel's professional obligations and the consequences of an inconsistent proffer to cabin much of the potential for mischief.

[16] In a letter submitted under Utah Rule of Appellate Procedure 24(j), Met argues for the first time that it would be "grossly unfair" to retroactively apply a rule requiring a defendant to create a record to preserve a Fifth Amendment claim. By its plain language, rule 24(j) allows a party to advise the court of "pertinent and significant authorities" that come to the party's attention. The rule is not a vehicle to permit a party to supplement his or her briefing with new arguments and, to that end, the rule requires the letter to reference the "page of the brief" or "a point argued orally to which the

(continued . . .)

### III. The District Court Did Not Err in Determining that the FBI Agents' Warrantless Search of Met's Apartment Was Reasonable Under the Fourth Amendment

¶64 Met next argues that the district court erred by denying his motion to suppress. He contends that the warrantless search of his apartment was unreasonable within the meaning of the Fourth Amendment because FBI agents did not obtain valid consent and because "no exigent circumstances existed requiring a warrantless search." He contends therefore that the district court should have suppressed all evidence flowing from the police's alleged illegal search of his apartment. The State concedes that it did not obtain a warrant to search Met's apartment but argues that the search meets two exceptions to the Fourth Amendment's warrant requirement. We agree.

¶65 The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. A fundamental tenet of the Fourth Amendment is that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citation omitted). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* (citation omitted).

¶66 One exception allows officers to conduct a warrantless search when they obtain consent to conduct the search. *See State v. Harding*, 2011 UT 78, ¶ 10, 282 P.3d 31 (citing *Kentucky v. King*, 563 U.S. 452, 463 (2011)). Consent to search a home "may come from the person whose property is to be searched, from a third party who has common authority over the property, or from a third party who has apparent authority to consent to a search of the property." *Id.* (citations omitted).

¶67 Another exception allows a warrantless search where exigent circumstances indicate a "need to assist persons who are seriously injured or threatened with such injury." *Stuart*, 547 U.S. at 403. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the

---

citations pertain." Met does neither. And retroactive application was neither briefed nor mentioned at oral argument.

circumstances, viewed *objectively,* justify [the] action.'" *Id.* at 404 (alteration in original) (citation omitted).

¶68 The district court denied Met's motion to suppress because it determined that the agents obtained consent from Met's roommates to search the apartment's common areas, including the basement's main room and bathroom; that Met's roommates had "common authority" to consent to a search of the common areas; and that "even if [Met's] roommates did not have common access to the basement bathroom, based upon the 'exigencies of the situation,' the agents had legal cause to search the basement bathroom without consent."

¶69 Met's challenge to the district court's order is twofold. First, Met contends that his roommate did not have common authority over the basement of the apartment and so could not consent to the police's search of the basement. Second, Met contends that exigent circumstances did not justify the search of the basement because police had no probable cause to believe Victim was in the apartment until their search of the main room of the basement.

*A. Met's Roommate Had Common Authority to Consent to a Search of the Main Room of the Basement*

¶70 To resolve whether a third party has actual common authority to grant consent to a search of property, we must determine "whether the third party has mutual use and control of the property such that the other party has 'assumed the risk that [the third party] might permit the [property] to be searched.'" *Harding*, 2011 UT 78, ¶ 11 (alterations in original) (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)); *see also Georgia v. Randolph*, 547 U.S. 103, 106 (2006) ("The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained."). Common authority exists where there is "mutual use of the property by persons generally having joint access or control for most purposes."[17] *Matlock*, 415 U.S. at 171 n.7.

---

[17] Met contends that our review of the roommates' actual authority to consent to the agents' search of the basement main room and bathroom is restricted to the facts known to the agents at the

(continued . . .)

¶71 The United States Supreme Court has, however, cautioned against drawing a bright-line rule to determine whether a third party has the authority to consent to a police search. *See Randolph*, 547 U.S. at 111. "The constant element in assessing Fourth Amendment reasonableness in the consent cases . . . is the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules." *Id.* The Court reasoned,

> *Matlock* . . . not only holds that a solitary co-inhabitant may sometimes consent to a search of shared premises, but stands for the proposition that the reasonableness of such a search is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests.

*Id.*

¶72 It is undisputed that one of Met's roommates actually consented to the agents' search of the apartment. The only issue, then, is whether Met's roommate had the authority to consent to a search of the basement's main room and bathroom.

¶73 The district court concluded that all of Met's roommates had common authority over and access to the main room and bathroom of the basement "and gave appropriate consent to the agents to search that area."[18] The district court found that each of Met's

---

time the consent was given. We disagree. A court is permitted to look at facts not known to the officers at the time they obtain consent to determine whether the consenting party had actual authority to consent. *See State v. Buhler*, 52 P.3d 329, 333–34 (Idaho Ct. App. 2002) (holding "that the State is not limited to relying upon information known to the police at the time of their warrantless entry in order to prove actual authority possessed by the person who consented to the search"); *see also United States v. Groves*, 530 F.3d 506, 510 n.1 (7th Cir. 2008) ("Of course, many of these facts were not known by the officers until after they entered the premises and thus those facts are relevant only to actual and not apparent authority to consent.").

[18] Because we subsequently affirm the district court's holding that the agents' warrantless search of the basement bathroom was authorized by exigent circumstances, we decline to review the district court's conclusion that the roommates could and did consent

(continued . . .)

roommates "had equal access and control" over the main room of the basement and thus could authorize a police search of the main room. The district court's determination rested largely on testimony that Met's roommates stored personal belongings, including mountain bikes and DVDs, in the main room of the basement, and on the roommates' testimony that they could "come and go" from the basement main room "without asking permission from [Met]."

¶74 Met contends that his roommates could not consent to a search of the basement because they did not have authority to access the basement. Met also contends there was no common authority because "[t]he State presented no evidence that the consentor, [Met's roommate], had 'shared use of the premises and joint access or control' of the basement." We disagree. The State presented sufficient evidence to establish that Met's roommates had common authority over the basement main room. *See State v. Perea*, 2013 UT 68, ¶ 32, 322 P.3d 624 (stating that we review a district court's factual findings in support of a suppression ruling for clear error, which we will only find "if the court's factual findings 'are not adequately supported by the record, resolving all disputes in the evidence in a light most favorable to the trial court's determination'" (citation omitted)). First, the roommates' testimony that they stored personal belongings in the main room of the basement is strong evidence that they had joint access to and control over the basement main room. On appeal, Met concedes this point, admitting that the roommates were authorized to enter the basement. But Met attempts to argue that this "limited purpose" entry does not confer common authority. Beyond his failure to cite authority to support this proposition, Met fails to credit our holding in *State v. Brown*, 853 P.2d 851 (Utah 1992).

¶75 In *Brown*, we reviewed the denial of a defendant's motion to suppress evidence obtained in a trailer shared by the defendant and two other individuals. *See id.* at 855. In addition to allowing the three individuals to reside in the trailer, the owner of the trailer also stored food and other materials for his employees in the "common area" of the trailer. *Id.* The record also indicated that access to the common area of the trailer was extended to individuals beyond the three residents. *Id.* We concluded that the trailer owner had a right to consent to the search of the common areas of the trailer because of its common use by many individuals, including the owner. *Id.* at 856.

to the agents' search of the basement bathroom by virtue of their common authority over the bathroom.

¶76 Similar to *Brown*, the record here indicates that Met's roommates had common authority over the basement main room. The State presented evidence demonstrating that Met's roommates actually used the basement main room to store certain personal items, that one of the roommates "used to go down [in the basement] to get" his DVDs, and testimony that Met's roommates could access the main room without first obtaining Met's permission. In addition, the basement was not enclosed or set off from the rest of the apartment by a door or in any other way; the basement main room was accessible from the main floor via an open stairway. Met attempts to conflate his roommates' general lack of need or desire to enter the basement with a lack of authority to enter the basement. Although Met's roommates may have infrequently accessed the basement main room in the short time Met resided there, there is sufficient evidence to indicate that they had the authority to do so if the need or desire arose. In light of the roommates' access to the basement main room, they possessed the authority to consent to the search of that area.[19]

---

[19] Met also raises *State v. Duran*, 2005 UT App 409, 131 P.3d 246, *aff'd*, 2007 UT 23, 156 P.3d 795, as evidence that the district court should have determined that Met's roommates lacked common authority in this case. In *Duran*, the Utah Court of Appeals concluded that an owner of a trailer, who rented the trailer to her son, could not consent to a police search of the trailer because "[t]he State presented no evidence that would support a finding that Mother shared the use of the [trailer]." *Id.* ¶ 12. The court reasoned, "[t]here is no evidence that Mother had a key to the trailer or that she could enter it when [her son] was not present. Without a showing of common authority, Mother could not give valid consent to the search." *Id.*

*Duran* is distinguishable from this case in important respects. In *Duran*, the State "presented no evidence" that the mother had the authority to access the trailer without her son's permission. *See id.* Nor did the State present any evidence that the mother actually accessed the trailer for any purpose. *Id.* But here there is ample evidence demonstrating that Met's roommates could and actually did access the basement main room without first obtaining Met's consent.

¶77 We thus conclude that the district court did not err in concluding that Met's roommates had common authority to consent to the agent's warrantless search of the basement main room.

*B. The 'Exigencies of the Situation' Authorized the Agents' Warrantless Search of the Basement Bathroom Once They Found Blood in the Main Room of the Basement*

¶78 Met also contends that the district court erred in concluding "that exigent circumstances justified the warrantless search of the basement." The court determined that the agents' warrantless search of the basement bathroom was authorized as an exigent circumstance indicating a "need to protect or preserve life or avoid serious injury." The district court determined that once the agents entered the basement's main room and observed blood on the carpet and blood splatter on a wall, they were justified in searching the entire basement because "they were looking for a missing child that could have been seriously injured."

¶79 Courts have long recognized that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Stuart*, 547 U.S. at 403. Our analysis under this standard is restricted to determining whether the officers' beliefs were "plainly reasonable under the circumstances." *Id.* at 406.

¶80 We agree with the district court that once the officers saw the blood on the carpet and walls, it was "plainly reasonable" for them to conclude that exigent circumstances justified entering the other basement rooms without first obtaining a warrant. As the district court aptly described, at the time the officers became aware of the blood stains on the basement's walls and floor, "the agents were not looking for a dead body; they were looking for a missing child that could have been seriously injured." The blood would have suggested to a reasonable officer that someone, possibly Victim—who at that point had been missing for fewer than thirty-six hours and had disappeared from the apartment complex the officers were searching—had been seriously injured and, if still alive, was likely in need of emergency assistance. Because of the potential need to render emergency assistance, it was objectively reasonable for the agents to enter the basement bathroom, which excuses their failure to obtain a warrant prior to entering.

¶81 In light of the combination of actual consent for the search of the main basement room and exigent circumstances allowing warrantless entry into the bathroom, the district court did not err in

denying Met's motion to suppress evidence obtained from the warrantless search of Met's apartment.[20]

## IV. The District Court Did Not Err in Admitting
## Two Photographs into Evidence

¶82 Met also argues that the district court erred by admitting two photographs into evidence that he argues are "gruesome and inflammatory." We disagree; the court properly ruled that the photographs are admissible under rule 403 of the Utah Rules of Evidence. Before we analyze the district court's decision, however, we clarify the standard a district court should employ to assess the admissibility of allegedly gruesome photographs.

¶83 Utah Rule of Evidence 403 provides the test for evidence's admissibility. The gruesomeness test this court described in *State v. Lafferty*, 749 P.2d 1239 (Utah 1988), and the factors this court outlined in *State v. Bluff*, 2002 UT 66, 52 P.3d 1210, distract from the plain language of the Utah Rules of Evidence. Admissibility of allegedly gruesome materials should be assessed without the gloss that we have placed upon rule 403.

*A. The Historical Development of Utah's Gruesome-Photograph Test*

¶84 It appears that the first published cases discussing the admissibility of arguably gruesome photographs utilized the then-applicable version of rule 403 of the Utah Rules of Evidence. *See State v. Woods*, 220 P. 215, 220 (Utah 1923); *see also State v. Poe*, 441 P.2d 512, 515 (Utah 1968) ("[I]t is within the sound discretion of the trial court to determine whether the inflammatory nature of such slides is outweighed by their probative value with respect to a fact in issue. If the latter they may be admitted even though gruesome.").[21]

¶85 In the 1980s, however, this court began to focus on factors the plain language of rule 403 did not contain and to impose

---

[20] Met argues only that exigent circumstances did not exist here; he raises no argument that the agents' search of the basement exceeded the proper scope or duration of an exigency-based search. Accordingly, we do not address those issues.

[21] *See generally* R. COLLIN MANGRUM & DEE BENSON, MANGRUM & BENSON ON UTAH EVIDENCE 170–73 (2015) (describing the history of rule 403 of the Utah Rules of Evidence as applied to "gruesome" photographs and videos).

additional burdens on the evidence's proponent. In *State v. Garcia*, this court concluded that gruesome color photographs of homicide victims should be reviewed to determine "whether the viewing of the photographs by the jury would create a substantial danger of undue prejudice against the defendant, and if so, whether that danger substantially outweighs the photographs' *essential* evidentiary value." 663 P.2d 60, 64 (Utah 1983). The court also explained that "[t]he point of the reference to '*essential* evidentiary value' in the context of potentially prejudicial photographs of the victim's body is that such photographs would generally be inappropriate where the only relevant evidence they convey can be put before the jury readily and accurately by other means not accompanied by the potential prejudice." *Id.* Then, based on *Garcia*, this court pronounced in *State v. Cloud* that "potentially prejudicial photographs are 'generally inappropriate' and should not be admitted in evidence unless they have some essential evidentiary value that outweighs their unfairly prejudicial impact. Only after a determination has been made that the photographs have such value need the weighing be made." 722 P.2d 750, 753 (Utah 1986) (citation omitted).

¶86  Later, in *State v. Lafferty*, this court created a test that we said would apply to "certain categories of relevant evidence" with "an unusually strong propensity to unfairly prejudice, inflame, or mislead a jury." 749 P.2d at 1256. When the State attempts to admit certain evidence, including "gruesome photographs of a homicide victim's corpse," we held that the State must show that the evidence possessed "*unusual* probative value." *Id.* (emphasis added). The court cautioned that this evidence "is uniquely subject to being used to distort the deliberative process and improperly skew the outcome" and held that "the probative value of such evidence is presumed to be 'substantially outweighed by the danger of unfair prejudice.'" *Id.* (citation omitted).

¶87 We later described a three-part test "for reviewing the admissibility of allegedly gruesome photographs":

> First, we determine whether the photograph is relevant. Second, we consider whether the photograph is gruesome. Finally, we apply the appropriate balancing test. If the photograph is gruesome, it should not be admitted unless the State can show that the probative value of the photograph substantially outweighs the risk of unfair prejudice. If the photograph is not gruesome, it should be admitted

unless the defendant can show that the risk of unfair prejudice substantially outweighs the probative value of the photograph.

*State v. Gulbransen*, 2005 UT 7, ¶ 34, 106 P.3d 734 (citation omitted).

¶88 To guide courts in the determination of whether a photograph is gruesome, we eventually articulated a number of nonexclusive factors for consideration:

> First, we consider whether the photograph is in color or black and white, because color photographs are generally more disturbing because of their ability to provide the viewer with vivid images of blood, wounds, bruising, and the like. . . . Color alone is not determinative, however. . . . Second, we consider whether the photograph is an enlargement or close-up shot, again, because enlarged photographs and close-ups show greater detail and therefore are often more disturbing than a life-like view. . . . Also, an enlargement or close-up may give a distorted impression of the thing photographed. Third, we consider when the photograph was taken in relation to the crime and whether it depicts the victim as found at the crime scene. . . . Fourth, we consider whether other details in a photograph, aside from the victim, may render a photograph gruesome [because] the composition in the photograph may exacerbate the photograph's impact on the viewer.

*State v. Bluff*, 2002 UT 66, ¶ 43, 52 P.3d 1210 (alterations in original) (citation omitted). "The purpose of considering these factors" we held, "is to identify photographs that have a tendency to 'unfairly prejudice, inflame, or mislead the jury.'" *Id.*

### B. The Proper Standard for Assessing the Admissibility of Allegedly Gruesome Photographs

¶89 This case presents the opportunity to explicitly abandon the test that *Lafferty*, *Bluff*, and *Gulbransen* describe. All relevant photographs, regardless of their alleged "gruesomeness," are subject to the balancing test set out in rule 403. Thus, upon a challenge to the admissibility of a photograph, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See* UTAH R. EVID. 403.

The burden rests on the shoulders of the party seeking to exclude the photograph to prove that its potential for unfair prejudice substantially outweighs its probative value.

¶90 Because we disavow the need for a threshold determination of gruesomeness, we also abandon the factors *Bluff* discussed as any sort of formal test. That is not to say that the factors identified in our prior cases should be forever consigned to the dust-bin. Indeed, a district court may consider the unfair prejudice that might flow from a photograph that depicts a close-up or enlarged view of a wound. But parties are not required to view the factors *Bluff* discussed as a mandatory checklist for admission, and courts should not treat them as factors to be weighed against one another.[22] Rather, these considerations, if used, must be utilized to inform the ultimate rule 403 test—whether the probative value of a photograph is *substantially outweighed* by a danger of unfair prejudice or the other considerations rule 403 describes.

### C. The District Court Did Not Err in Admitting the Two Photographs into Evidence

¶91 The first photograph Met challenges

> depicts [Victim] lying face down in a shower stall. Her face is not visible. The top of [Victim's] head is not depicted in the photo, nor are her arms; however, one wrist and one hand are showing. She is wearing a pink coat and a pink skirt. Her skirt is raised to show that she is not wearing any underwear. Her legs are pushed up in a bent position so that her knees are above her waist. The photo does not show any blood or obvious bruising or wounds on the body.

The second photograph "depicts a clean, close-up shot of [Victim's] genitalia." The photo does not include "blood or other open or

---

[22] We recently reached a similar conclusion about the so-called *Shickles* factors in *State v. Cuttler*, 2015 UT 95, ¶ 18, 367 P.3d 981. There, we noted that the "*Shickles* factors should not limit the considerations of a court when making a determination of evidence's admissibility under rule 403." *Id*. But we also instructed that "this is not to say that the *Shickles* factors, taken individually, have no place in a rule 403 analysis." *Id*. ¶ 19.

graphic injuries." The district court ruled that both photographs were admissible under the Utah Rules of Evidence.

¶92 The court found the first photograph was relevant under rule 401 because "[i]t shows, among other things, the clothes [Victim] was wearing at the time she died, the location of [Victim's] body, the position she was in, and that she was not wearing any underwear—evidence relevant to some of the aggravating factors associated with the aggravated murder charge." The court also noted that the photograph, together with other photographs, demonstrates that a struggle took place upstairs and extended to the basement bathroom and that "shower water was run over [Victim's] body."

¶93 The court also found that the first photograph satisfied rule 403—i.e., that its probative value is not substantially outweighed by the danger of unfair prejudice.[23] *See* UTAH R. EVID. 403. It reasoned, "The photograph is highly probative, and the Court does not perceive that the photo will lead a jury to be so shocked and angry . . . that they will be overwhelmed by emotion and be unable to fairly judge the facts of the case."

¶94 The court found the second photograph to be relevant because the photograph showing "the three-dimensional nature of the wound is necessary to show penetration, an element of some of the aggravating factors associated with the charge of aggravated murder." The court also determined that the photograph satisfied rule 403 because it was a clean photograph, highly probative of Victim's genital injury, and because viewing the photograph would not "lead the jurors to become so angry or upset that they [would] be unable to fairly judge the facts of the case."

¶95 Met does not challenge the relevance of the photographs, but argues that the district court should have excluded them because they were "gratuitous, unnecessary, [and] inflammatory and prejudicial."

¶96 Our standard of review prevents us from overturning a district court's rule 403 evidentiary ruling unless the district court abused its discretion. *See State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d

---

[23] The district court applied the ordinary rule 403 balancing test, rather than the "gruesomeness" test set out in *Lafferty*, which we now abandon, to the two photographs because it concluded that the two photographs were not gruesome.

981. A district court abuses its discretion under rule 403 only where it applies the wrong legal standard or its decision "is beyond the limits of reasonability." *Id.* (citation omitted). Met argues that the district court applied the wrong legal standard by failing to review the photographs under the gruesomeness standard in *Lafferty.* We need not review the district court's determination that the photographs were not gruesome within the meaning of *Lafferty* because we conclude that the test set out in *Lafferty* is no longer good law and because the district court determined the admissibility of the photographs under the correct legal standard—the balancing test set out in rule 403.

¶97    We also reject Met's argument that the district court erred in its application of rule 403. The two photographs, while unpleasant to view, have probative value. The photographs support the State's contentions that Victim had been sexually assaulted; that her underwear had been removed; that a lengthy confrontation took place between Victim and her assailant; that Victim's body was wet, demonstrating that the assailant likely attempted to wash evidence from Victim; and the condition and location of Victim's body. The court did not err in concluding that the photographs had probative value. *See State v. Renzo*, 443 P.2d 392, 397 (Utah 1968) ("While the pictures admitted in evidence might be improper to show outside of the courtroom, they afforded mute evidence of the depravity of the one who killed the victim. This evidence was material and relevant.").

¶98    Nor has Met shown that the district court abused its discretion by concluding that the photographs did not present risk of unfair prejudice. Met contends the evidence should have been excluded because one showed the Victim "laying crumpled up, lifeless in a shower stall" and the other is a "particularly horrific photo of [Victim's] vaginal opening, in gruesome and horrific detail." Met complains that both photographs were projected onto a screen for the jury's view. The district court concluded the first photograph is not unduly prejudicial because it does not show the Victim's face, open wounds, physical injuries, or blood. The second photograph, according to the district court, is a sterile depiction of Victim's genitalia, devoid of blood or open injuries. The district court ultimately concluded that the photographs are not so graphic that they "will lead the jurors to become so angry or upset that they will be unable to fairly judge the facts of the case." Met has not met his burden of establishing that these conclusions fell outside the bounds of the district court's discretion.

## V. The District Court Correctly Determined that Met's Child Kidnapping Conviction Does Not Merge with His Aggravated Murder Conviction

¶99    Met next contends that the district court erred by failing to merge his child kidnapping conviction with his aggravated murder conviction. The district court denied Met's motion to merge the convictions because "sufficient evidence" supported "a separate conviction on the child kidnapping count in addition to the aggravated murder count."[24]

¶100   The doctrine of common law merger exists to prevent a criminal defendant from being "punished twice for conduct that amounts to only one offense, a result contrary to protections against double jeopardy." *State v. Lee*, 2006 UT 5, ¶ 31, 128 P.3d 1179. We have noted that some "crimes may be so related that they must merge even though neither is a lesser included offense of the other." *Id.* In *State v. Finlayson*, this court adopted a test to determine when a conviction based on a detention "incidental to" another crime should be merged with the related crime:

> [I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnaping the resulting movement or confinement:
>
>     (a) Must not be slight, inconsequential and merely incidental to the other crime;
>
>     (b) Must not be of the kind inherent in the nature of the other crime; and
>
>     (c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

2000 UT 10, ¶ 23, 994 P.2d 1243 (alteration in original).

---

[24] The district court also denied the motion because it concluded Utah Code section 76-5-202(5) prevented the merger of Met's two convictions. Met does not appear to challenge this conclusion, but the State has not asked us to affirm on this alternative ground. Because neither party has briefed the issue, we confine our analysis to Met's contention that the convictions should be merged under *State v. Finlayson*, 2000 UT 10, ¶ 23, 994 P.2d 1243.

¶101   In *Finlayson*, we reversed the defendant's conviction for aggravated kidnapping while affirming his convictions for forcible sodomy and rape. *See id.* ¶ 1. Finlayson sexually assaulted a college classmate. *Id.* ¶¶ 2–4. Finlayson detained the victim for a period of time after the sexual assault and prevented victim's several attempts to escape from the apartment. *Id.* ¶ 4. Later, Finlayson drove victim around in the car for approximately an hour until he dropped the victim off at her apartment. *Id.* ¶ 5.

¶102   We concluded that "Finlayson's detention of the victim up to the time of the rape and sodomy was incidental to the assault, rather than having an independent significance." *Id.* ¶ 23. Finlayson's "carrying the victim into the bedroom, handcuffing her, and physically preventing her escape while the sex crimes were in progress constituted a detention that was 'slight, inconsequential and merely incidental to the other crime[s].'" *Id.* (alteration in original). We reasoned that "to hold otherwise would transform virtually every rape and robbery into a kidnapping as well." *Id.* We also noted that Finlayson's actions after the assault—detaining the victim for ten minutes before driving her home and driving her home for at least half an hour longer than necessary, by a circuitous route, with a jacket over her head—had independent significance from the detention inherent in sexual assault. *Id.* ¶ 32–33. We found, however, that the detention did not transform the kidnapping into an aggravated kidnapping because Finlayson did not act with the intent to facilitate his flight from the assault. *Id.* ¶ 33.

¶103 In *State v. Lee*, we examined whether a defendant's kidnapping conviction should merge with his aggravated assault conviction. *See* 2006 UT 5, ¶ 1, 128 P.3d 1179. Lee approached two eighteen-year-old women who were walking on the side of a highway. *Id.* ¶ 3. After the two declined Lee's offer to "party," Lee grabbed and sexually assaulted one of the women. *Id.* ¶ 4. The women escaped, but Lee caught up with them. *Id.* The defendant approached the pair from behind and grabbed one of the women by the hair, "slammed her to the pavement," and then "proceeded to drag her by the hair across" the highway to an alley between two buildings. *Id.* Lee kicked the woman multiple times in the head, "rolled her over, pulled down her pants, and got on top of her." *Id.* After the second woman intervened, the two were able to escape from the defendant. *Id.* ¶ 5. Lee was eventually arrested, charged, and convicted of two counts of aggravated assault and one count of aggravated kidnapping. *Id.* ¶ 10.

¶104   Lee argued that the district court plainly erred by failing to merge his aggravated kidnapping conviction into his aggravated assault conviction. He claimed that "any kidnap[p]ing . . . was merely a component of the corresponding assault; it was incidental to, and indeed indistinguishable from, the assault." *Id.* ¶ 25. We rejected that argument and concluded that "dragging [the victim] across a highway by her hair was not 'slight, inconsequential and merely incidental to' the assault Lee had already commenced against her." *Id.* ¶ 34 (citation omitted). Nor was the kidnapping "inherent in the nature of" the assault; we noted that "most assaults do not involve the relocation of the victim from one site to another." *Id.* We also concluded that the kidnapping was independently significant from the assault because it allowed Lee to relocate the victim away from her friend, "thereby rendering further assault, or even rape, 'substantially easier of commission'" and because it significantly reduced the potential that defendant's crime would be detected. *Id.* (citation omitted).[25]

---

[25] It is not immediately apparent how to distinguish the detention in *Finlayson*—which we found to have no independent significance—from the detention in *Lee*—which we concluded supported a separate kidnapping conviction. Finlayson moved the victim from an unidentified room in his apartment to his bedroom, where he handcuffed her; Lee dragged a victim across Highway 40 to an alley separating two buildings. The different conclusions might be explained by our observation that "[t]he only argument asserted by the prosecutor at trial in support of the aggravated kidnapping charge was defendant's handcuffing of the victim." *Finlayson*, 2000 UT 10, ¶ 13. So the question of whether relocating the victim possessed independent significance was not presented at trial or on appeal.

*Finlayson* also does not adequately explain why we concluded that the detention—including handcuffing the victim—was merely incidental and did not make "the other crime substantially easier of commission." *Id*. ¶ 23 (citation omitted). Our recitation of the facts recounts that Finlayson's victim had "made several unsuccessful attempts to escape" until Finlayson "handcuffed her." *Id*. ¶ 4. Perhaps the results in *Finlayson* and *Lee* cannot be easily reconciled and we have not yet had the opportunity to reconsider our conclusion that handcuffing the victim in response to one of "several unsuccessful attempts to escape" was "incidental to the assault,

(continued . . .)

¶105   On appeal, Met contends there was "no proof that any detention exceeded that necessary to commit the assault and homicide." The district court, applying the *Finlayson* test and *Lee's* reasoning, correctly concluded that Met's detention of Victim had significance independent from the detention involved in her murder.

¶106   First, Met's kidnapping of Victim was more than "slight, inconsequential and merely incidental to" the murder. *See Finlayson*, 2000 UT 10, ¶ 23. The district court noted that "the crime scene evidence shows that [Victim] and [Met] had an extended confrontation," that "the blood scene evidence shows that [Victim] was moved throughout the downstairs of the apartment," and that a "trail of blood led from the bottom of the stairs into the downstairs bathroom where [Victim's] body was later found." Moreover, medical experts opined that Victim was alive when she was sexually assaulted and that Victim had suffered many injuries that were non-life threatening and independent from those that caused her death. The sexual assault and relocation constituted, in the district court's words, "a detention apart from the time that it took to cause the homicide."

¶107   Second, the district court did not err in concluding that a detention of the kind at issue here is not "inherent in the nature" of murder. *See id.* As noted above, Met engaged in a number of actions that were extraneous to the murder: he sexually assaulted Victim and inflicted numerous non-life-threatening injuries upon her. Met's kidnapping and relocation of Victim are not so intertwined with the murder that we can say that the former are *inherent* in the nature of the latter.

¶108   Last, the district court correctly concluded that the detention had "some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." *See id.* The court noted that evidence "showed that the assault began somewhere on the stairs of the apartment and ended in the bathroom. Had the assault begun and ended at the bottom of the stairs, [Met's] room-mates may have seen [Victim] as soon as they returned home." This

_____

rather than having an independent significance." *Id.* ¶¶ 4, 23. Or perhaps we need to, in the appropriate case, examine the concerns that motivated us to adopt the doctrine of common-law merger, assess the continued potency of those concerns, and evaluate whether *Finlayson* continues to be the correct test to address them.

allowed the district court to properly decide that Met's detention of Victim substantially lessened the risk of detection and infused the detention with significance independent of the murder.

¶109 The district court did not err in declining to merge Met's child kidnapping and aggravated murder convictions. Victim's detention was sufficiently independent of her murder such that Met is not being punished twice for the same conduct.

## VI. Met Was Not Prejudiced by His Trial Counsel's Decision to Withdraw the Mistrial Motion

¶110 Met also contends that his trial counsel provided constitutionally ineffective assistance by withdrawing a mistrial motion based on a crime scene investigator's failure to test or preserve a spot, which may have contained blood, found on the upstairs floor of Met's apartment.

¶111 On the eighth day of trial, a prosecutor notified the district court and opposing counsel of potentially exculpatory evidence. The prosecutor stated that he learned the previous night that a crime scene investigator had tested a reddish-brown spot on the upstairs floor of the apartment and preliminary tests had indicated that it was blood. The investigator and his team did not conduct further testing of, or otherwise preserve, the spot because they believed that the upstairs was not a relevant part of the crime scene. Prior to the revelation, the prosecutor had apparently been under the impression that the spot was betel-nut residue. Met's trial counsel initially pursued a mistrial motion based on the State's failure to test and preserve the evidence, but later withdrew that motion, representing to the court that further research had suggested that the motion would not succeed.

¶112 A defendant's Sixth Amendment right to counsel embraces the right to the effective assistance of counsel. *See McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). Under *Strickland v. Washington*, a defendant must meet a two-part test to effectuate an ineffective assistance of counsel claim. *See* 466 U.S. 668, 687 (1984). First, "the defendant must show that counsel's performance was deficient." *Id.* This requires a showing "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, "the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from

a breakdown in the adversary process that renders the result unreliable." *Id.*

¶113 Moreover, we "indulge in a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance, and that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Houston*, 2015 UT 40, ¶ 70, 353 P.3d 55 (alteration in original) (citation omitted). This presumption accounts for the widely varying "circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* (alteration in original) (citation omitted).

¶114 Even assuming, however, that Met's trial counsel's failure to pursue the mistrial motion was deficient, we conclude that Met cannot establish that he was prejudiced by his trial counsel's failure to pursue the mistrial motion. To establish prejudice under *Strickland*, Met must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. This probability must be sufficient to "undermine [our] confidence in the outcome" of the proceeding. *Id.* And even viewing the destroyed evidence most favorably to Met, we cannot with confidence say that the result in this case would have been different.

¶115 Substantial evidence ties Met to the Victim's murder. Met had a relationship with Victim. Victim was discovered in Met's bathroom. Multiple spots of Victim's blood were found on the denim jacket Met wore the night he was arrested. Met was identified as a possible source of DNA found under Victim's fingernails, while Met's roommates were ruled out as contributors. Met also had various injuries on his inner thigh, hip, and calf that were consistent with scrapes caused by fingernails.

¶116 Moreover, the unpreserved spot was located far away from the other evidence of Victim's murder. Met does not articulate how this spot, even assuming it was blood, would have affected the proceedings. Met does not provide us with the argument that he would have made had he known about the blood spot nor does he attempt to explain how this evidence would have changed his approach at trial or the trial's outcome. And we are not convinced—given the entirety of the evidentiary picture presented at trial—that the proceedings in this case would have been impacted. Thus, even assuming that Met's trial counsel provided ineffective assistance, our confidence in the jury's verdict is not undermined.

## VII. The District Court's Misstatement of Law

¶117   Met argues that the district court erred in sentencing him on the aggravated murder charge because it mistakenly believed that life without parole was the presumptive sentence for aggravated murder. During sentencing, the court correctly determined the presumptive sentence for Met's child kidnapping conviction with aggravating circumstances to be life in prison without parole. *See* UTAH CODE § 76-5-301.1(3)(b). But the court incorrectly stated that the presumptive sentence for Met's aggravated murder conviction was life in prison without parole. The court then sentenced Met to life in prison without the possibility of parole for his aggravated murder conviction. The court ordered the two life-without-parole sentences to be served concurrently.

¶118   Contrary to the court's statement, Utah Code section 76-3-207.7 provides that those convicted of noncapital aggravated murder shall be sentenced to "life in prison without parole[] *or* an indeterminate prison term of not less than 20 years and which may be for life." UTAH CODE § 76-3-207.7 (2007) (emphasis added). The statute's plain language does not contain the presumption the district court described. Rather, it is within the court's discretion, after considering and weighing the applicable sentencing factors, to sentence Met to either an indeterminate term of not less than twenty years or for a term of life in prison without parole.

¶119   We have previously considered how to proceed in a similar circumstance. In *State v. Reece*, the defendant argued that the sentencing court abused its discretion by sentencing him to life in prison without parole based on the incorrect belief that that sentence was the presumptive sentence under Utah Code section 76-3-207.7. 2015 UT 45, ¶ 81, 349 P.3d 712. The sentencing court imposed a sentence of life in prison without parole after considering "the totality of the circumstances" and weighing the aggravating and mitigating circumstances. *Id.* ¶ 84. The court's later post-trial ruling, however, stated that life in prison without parole "was the presumptive sentence." *Id.* We agreed that this was an incorrect interpretation of the statute and noted "that the due process clause of the Utah Constitution 'requires that a sentencing judge act on reasonably reliable and relevant information in exercising discretion in fixing a sentence.'" *Id.* ¶ 81 (citation omitted).

¶120   Although we determined that the sentencing court had misconstrued the statute, we could not discern whether the sentencing court's incorrect understanding of the law had affected its sentencing decision. *See id.* ¶¶ 82–84. To resolve this ambiguity, we

remanded the sentencing decision to the district court. *Id.* ¶ 84. We directed the sentencing court to first "determine whether its incorrect reading of the sentencing statute affected its decision to impose [life in prison without parole]." *Id.* If the court determined that its incorrect statement of law had no effect on its sentencing decision, no further action by the court was required. *See id.* If, however, the sentencing judge determined that the incorrect understanding of the statute did impact its sentencing decision, then we directed the court to vacate the original sentence and "hold a new sentencing hearing." *Id.*

¶121 Similarly here, we remand the issue to the district court to allow the original sentencing judge to determine whether the incorrect statement affected the decision to impose life in prison without parole on the aggravated murder conviction. If the original sentencing judge concludes that it did, then the court must vacate the aggravated murder sentence and resentence Met on that conviction. If the original sentencing judge is unavailable or otherwise unable to consider the remanded issue, then the newly sitting judge must vacate the sentence and resentence solely on the aggravated murder conviction.[26]

## CONCLUSION

¶122 We affirm Met's child kidnapping and aggravated murder convictions. We again conclude that Utah Code section 76-3-207.7 is not unconstitutional. Met has also not demonstrated that the district court erred in the course of the trial in a manner that prejudiced him. We also affirm the district court's sentence of life in prison without parole on Met for the child kidnapping conviction. We remand, however, the court's sentence of life in prison without parole for Met's aggravated murder conviction. The district court misstated the law by indicating that section 76-3-207.7 creates a presumptive life sentence without parole for those convicted of noncapital aggravated murder. Section 76-3-207.7 does not in fact provide for a presumptive life sentence without parole but rather grants the sentencing court reasonable discretion to impose either an

---

[26] We again note that we affirm the district court's sentencing of Met to life in prison without parole for the child kidnapping conviction. We remand only the district court's sentencing of Met for the aggravated murder conviction.

indeterminate term of year sentence not less than twenty years or a life sentence without parole. *See* UTAH CODE § 76-3-207.7 (2007). We note that the court's discretion is bound by other statutory provisions "mandating that the criminal code 'shall be construed . . . [to p]revent arbitrary and oppressive treatment' and to impose 'penalties which are proportionate to the seriousness of offenses.'" *State v. Reece*, 2015 UT 45, ¶ 78, 349 P.3d 712 (alterations in original) (citation omitted).

¶123  We affirm the imposition of life in prison without parole as the sentence on the child kidnapping conviction. We remand the case to the district court for the limited purpose of permitting the original sentencing judge to examine whether the misstatement of law had a substantive effect on its sentencing decision with respect to the aggravated murder conviction. If the misstatement had a material effect, or if the original sentencing judge is not available, the district court should consider whether Met should be sentenced to "life in prison without parole[] *or* an indeterminate prison term of not less than 20 years and which may be for life." *See* UTAH CODE § 76-3-207.7 (2007) (emphasis added).

––––––––––––––

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring in the judgment:

¶124  I concur in the judgment of the court and also in the majority opinion in large part. I write separately only to articulate a different basis for rejecting the argument that Mr. Met's conviction on child kidnapping does not merge with his aggravated murder conviction. *See supra* ¶¶ 99–109.

¶125  The majority rejects this claim under the "common-law merger" standard set forth in *State v. Lee*, 2006 UT 5, ¶ 31, 128 P.3d 1179, and *State v. Finlayson*, 2000 UT 10, ¶ 23, 994 P.2d 1243. Yet the court acknowledges that our opinions in these cases may not be reconcilable, and adverts to the possible "need," in an "appropriate case," to "examine the concerns that motivated us to adopt the doctrine of common-law merger" and to "evaluate whether *Finlayson* continues to be the correct test" to "address" those concerns. *Supra* ¶ 104 n.25.

¶126  In my view this is the "appropriate case." The court's analysis, in my view, highlights fundamental problems with our doctrine of common-law merger. Our application of the *Lee-Finlayson* test underscores its unworkability. And it highlights a threshold

A.C.J. Lee: concurring in part and concurring in the judgment

deficiency in the whole enterprise of "common-law merger," which is that we have no common-law power in a field governed by statute.

¶127 The parties have accepted the viability of the *Lee-Finlayson* test and have confined their arguments to the proper outcome of the case under that test. But the basis and validity of the test is fair game in a case in which we are asked to apply it. We cannot apply the test without describing its content, and we cannot describe its content without identifying its basis in law. If we have reason to question the basis for a common-law test we are asked to apply, we can—and should—do so.[27]

¶128 I would do so here. I would consider (1) whether we have the power to articulate a common-law merger test in the face of a governing statute, and (2) if so, whether the *Lee-Finlayson* test is an appropriate means of exercising that power. I will outline my tentative views on these questions here. I will first articulate the grounds for questioning our authority to exercise common-law power in this field, and then identify some concerns with the unworkability of the *Lee-Finlayson* formulation of the operative test.

I

¶129 We have held "that, in some factual scenarios, crimes may be so related that they must merge" even where merger is not required by the constitution or by statute. *See Lee*, 2006 UT 5, ¶ 31. "Where two crimes are defined narrowly enough that proof of one does not constitute proof of the other, but broadly enough that both may arise from the same facts," we have said that "merger may be appropriate." *Id*. The most common application of this premise has been in cases involving sexual assault and kidnapping. We have said that "virtually every rape . . . involves a necessary detention." *Finlayson*, 2000 UT 10, ¶ 19. "[A]bsent a clear distinction" between

---

[27] *See Winward v. State*, 2012 UT 85, ¶ 43, 293 P.3d 259 (Lee, J., concurring in the judgment) (explaining the basis for reaching the question whether a common-law "egregious injustice" exception had been preempted by the Post-Conviction Remedies Act even when the parties accepted the exception in their briefing; noting that "[w]e cannot defensibly find such an exception unsatisfied without describing its content, and we cannot describe its content without articulating its basis in law").

sexual assault and kidnapping, we have warned that "virtually every rape . . . would automatically be a kidnap[p]ing as well." *Id.* And we have suggested that a conviction for both crimes may raise double jeopardy concerns—by imposing "double punishment for essentially the same act." *Id.*; *see also Lee*, 2006 UT 5, ¶ 31 (suggesting that "a criminal defendant could be punished twice for conduct that amounts to only one offense, a result contrary to protections against double jeopardy").

¶130　With these concerns in mind, we have articulated a test aimed at identifying kidnapping charges that are "incidental to" a sexual assault, or in other words that lack "an independent significance." *Finlayson*, 2000 UT 10, ¶ 23. The test states that a "confinement . . . alleged to have been done to facilitate the commission of another crime" can constitute kidnapping only if the confinement (a) is not "slight, inconsequential and merely incidental to the other crime," (b) is not "of the kind inherent in the nature of the other crime," and (c) has "some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." *Id.*

¶131　We have referred to the above as "common-law merger." *Supra* ¶ 100. But that seems a misnomer. Our criminal law is completely codified. UTAH CODE § 76-1-105 ("Common law crimes are abolished and no conduct is a crime unless made so by this code, other applicable statute or ordinance."). And the legislature has enacted a statute dictating the terms and conditions of merger of criminal offenses. *See* UTAH CODE § 76-1-402. I cannot see how we can exercise common-law power in the face of two crimes defined by statute, and any argument for the existence of such power is eliminated by the existence of a statute regulating the enterprise of merger in this field. *Schroeder Invs., L.C. v. Edwards*, 2013 UT 25, ¶¶ 22–23, 301 P.3d 994 (noting that where a statute speaks to the issue before the court "our judicial role is secondary (interpretation), not primary (policymaking)").

¶132 That leaves the constitutional—double jeopardy— question. But the concern identified in our cases is illusory. The double jeopardy provisions of both the United States and Utah Constitutions protect only against double jeopardy for the "same offense." U.S. CONST. amend. V ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb"); UTAH CONST. art. 1, § 12 ("nor shall any person be twice put in jeopardy for the same offense"). And both provisions have long been understood

A.C.J. LEE: concurring in part and concurring in the judgment

to operate at the *offense* level—as a protection against multiple punishments or serial prosecution of the same criminal offense. *See Blockburger v. United States*, 284 U.S. 299 (1932); *State v. Sosa*, 598 P.2d 342 (Utah 1979).

¶133   The operative test allows prosecution for distinctly *separate* offenses, and defines separateness based on whether each of two crimes contains distinct *elements*. Where each crime has distinct elements, there is no double jeopardy problem even where both crimes arise out of the exact same set of facts. *See Blockburger*, 284 U.S. at 304 (stating that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one[] is whether each provision requires proof of a fact which the other does not"); *Sosa*, 598 P.2d at 346 (holding that the "test emphasizes the elements of the two crimes," and that "[i]f each requires proof that the other does not," the Double Jeopardy Clause is "satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes" (citations omitted)).

¶134 The facts of *Blockburger* and *Sosa* are instructive. In *Blockburger* the defendant was charged and convicted on two separate charges arising out of a single sale of illegal drugs—one for the sale of "forbidden drugs except in or from the original stamped package" and another for the same sale of the same "drugs not in pursuance of a written order of the person to whom the drug is sold." 284 U.S. at 303–04. Thus, in *Blockburger* "there was but one sale, and the question [was] whether, both sections [of the federal criminal code] being violated by the same act, the accused committed two offenses or only one." *Id*. at 304. The court concluded that these were separate offenses because each crime required proof of a different element. And it accordingly held that there was no violation of double jeopardy in the defendant's conviction and punishment on both offenses. *See id*. (holding that "although both sections were violated by the one sale, two offenses were committed" because each crime required proof of an element not required on the other).

¶135   *Sosa* is along similar lines. In that case, the defendant was convicted on charges of carrying a loaded firearm in a vehicle under Utah Code section 76-10-505 (1953) and possession of a dangerous weapon by a convicted person under Utah Code section 76-10-503(1). 598 P.2d at 343. As in *Blockburger*, the *Sosa* court emphasized that the double jeopardy test "emphasizes the elements of the two crimes."

A.C.J. L<span>EE</span> concurring in part and concurring in the judgment

*Id.* at 346. And "[b]ecause the elements of [the defendant's] separate prosecutions differ[ed], and either offense could have been established without establishing the other," the court held that "the double jeopardy doctrine [did] not apply." *Id.*

¶136 The double jeopardy premise of the *Lee-Finlayson* test cannot stand in light of the above. *Blockburger* and *Sosa* squarely repudiate the notion that double jeopardy is offended when a criminal defendant is "punished twice" for the same conduct. *Lee*, 2006 UT 5, ¶ 31. And they preserve for the legislature the power to identify multiple crimes arising out of a single set of facts. So the question whether to impose multiple punishments for a single deplorable act is a legislative prerogative; the Double Jeopardy Clause has no say in the matter.

¶137 In Utah, moreover, we have a statute that regulates the matter of merger. Our legislature has provided that merger is appropriate "when the *same act of a defendant* under a single criminal episode" establishes "offenses which may be punished in different ways under different provisions of [the] code." U<span>TAH</span> C<span>ODE</span> § 76-1-402(1) (emphasis added). Where that is the case, "the act shall be punishable under only one such provision," and "an acquittal or conviction and sentence under any such provision bars a prosecution under any other such provision." *Id.*

¶138 The merger statute also calls for merger as to "included" offenses. *Id.* § 76-1-402(3). An "included" offense is one that is "established by proof of the same or less than all the facts required to establish the commission of the offense charged," *id.* § 76-1-402(3)(a); one that "constitutes an attempt, solicitation, conspiracy, or form of preparation to commit the offense charged or an offense otherwise included therein," *id.* § 76-1-402(3)(b); or one "specifically designated by a statute as a lesser included offense," *id.* § 76-1-402(3)(c). By statute, "[a] defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense." *Id.* § 76-1-402(3). This reflects a requirement of double jeopardy, as an included offense is also one that would be barred under *Blockburger/Sosa*. 284 U.S. at 304; 598 P.2d at 346.

¶139 I cannot see how this court could retain common-law power in light of this statute. The legislature has said that a criminal charge is barred only if it is an "included" offense or if it arises out of the very "same act of a defendant" that is punished in a different way under the code. *See id.* § 76-1-402(1), (3). And that statute seems

A.C.J. LEE: concurring in part and concurring in the judgment

to me to leave no room for this court to prescribe merger for crimes that are almost but not quite covered by the statute—for crimes that arise out of "*virtually*" the same conduct, or that impose "double punishment for *essentially* the same act." *Finlayson*, 2000 UT 10, ¶ 19 (emphasis added).

II

¶140 The factors set forth in *Finlayson* and *Lee* are also problematic on their own terms. None of them provide meaningful guidance or means of predictably distinguishing properly merged offenses from those that should not merge; collectively, they render our inquiry into common-law merger unworkable. And that is another consideration weighing in favor of reconsidering these decisions. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 40, 345 P.3d 553 ("[T]o determine whether a precedent has become firmly established," the court first asks "how well it has worked in practice."); *see also supra* ¶ 104 n.25 (acknowledging the difficulty of reconciling *Finlayson* and *Lee*).

¶141 The first-listed element asks whether the defendant's confinement of the victim is "slight, inconsequential and merely incidental to" another crime. *Finlayson*, 2000 UT 10, ¶ 23. That inquiry is hardly an objective one. *Slightness* is in the eye of the beholder. As to *consequentiality*, I would think that any detention that allows a defendant to commit a crime would be a matter of consequence. So how this element may play out in individual cases is anyone's guess.

¶142 The second element—whether the degree of confinement is "inherent in the nature of the other crime," *id.*—is also problematic. Confinement is never *inherent in the nature* of murder (the crime at issue here). Murder can certainly be committed without confining someone, as by poisoning them or shooting them with a gun. That holds even for sexual assault, as rape can be committed against an unconscious person or someone who is not physically detained but nonetheless does not consent. *See* UTAH CODE § 76-5-406(5) (stating that a rape "is without consent of the victim" if "the actor knows the victim is unconscious, unaware that the act is occurring, or physically unable to resist"). So this element makes no sense. And it again compounds the unpredictability of the inquiry.

¶143 The last element is whether the confinement has "some significance independent of the other crime" in making it "substantially easier of commission" or in "substantially lessen[ing]

A.C.J. LEE concurring in part and concurring in the judgment

the risk of detection." *Finlayson*, 2000 UT 10, ¶ 23. This inquiry is puzzling. It will always be substantially easier to commit a murder (or sexual assault) if the perpetrator has confined the victim to the extent required for kidnapping. So the last element again provides no basis for distinguishing properly merged offenses from those that should not merge.

¶144   Thus, the elements prescribed in *Finlayson* and *Lee* yield no workable test. And the problems inherent in implementing this test lend further weight to the argument for overruling these decisions.

### III

¶145   Our common-law merger precedents are premised on vague concerns about constitutional protections against double jeopardy. But those concerns seem unfounded for reasons explained above. And unless a conviction actually violates a defendant's rights under the constitution, we have no business overriding it as a common-law matter. That is doubly true where the legislature has enacted a statute that occupies the field of merger.

¶146   I see no basis for the common-law merger principle set forth in *Finlayson* and *Lee*. And I would overrule the standard set forth in those decisions rather than apply what I see as an unworkable test that we have no power to impose.

¶147   The only operative merger standard that I see in our law is that set forth by statute, Utah Code section 76-1-402. I would reject Mr. Met's merger argument on the ground that the conviction on his kidnapping offense is not based on the "same act" as that which sustained his murder conviction, as required under section 76-1-402(1), and is not an "included" offense under section 76-1-402(3).

––––––––––––